Filed 5/19/16  P. v. Montenegro CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069426 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FWV1101427) |
| CARMEN MONTELONGO MONTENEGRO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Gregory S. Tavill, Judge.  Affirmed.

Randall B. Bookout, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler and Julie L. Garland, Assistant Attorneys General, Barry Jay Carlton and James Henry Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Carmen Montelongo Montenegro of first degree murder. (Pen. Code,[1] § 187, subd. (a).) It found true an allegation that she personally used a deadly and dangerous weapon in the commission of the offense. (§ 12022, subd. (b)(1).) The court sentenced her to 25 years to life on the murder conviction, and one consecutive year on the enhancement.

Montenegro contends the court erroneously (1) denied her motion for acquittal under section 1118.1, given that insufficient evidence supported the charge she murdered the victim, Samuel Wiggins, much less with the intent required for first degree murder; (2) failed to instruct the jury sua sponte on the lesser included offense of provocation manslaughter, thus violating her constitutional right to due process of law; (3) instructed the jury with CALCRIM No. 359 regarding corpus delicti; and (4) instructed the jury with CALCRIM No. 362 regarding consciousness of guilt. Montenegro further contends there was cumulative error. We affirm the judgment.

BACKGROUND

*Prosecution's Case-in-Chief*

Samuel Wiggins was last seen alive in late April 2011. Police did not know the exact date he was murdered, but believed based on their investigation that it happened in the last week of April 2011.

Araceli Falcon, one of Wiggins's next-door neighbors in Diamond Bar, California, testified Wiggins introduced Montenegro to her as his date "maybe [in] 2009," and at one

---

[1] All statutory references are to the Penal Code unless otherwise stated.

2

point Montenegro lived with Wiggins for approximately one year. When Falcon last saw Wiggins in April 2011, he did not seem himself; rather, he was moving slowly, his speech was slurred, and he seemed worn down. In April or May 2011, she saw a van with a carpet near it parked in front of Wiggins's house. Falcon was surprised because Wiggins had not consulted her about changes to his house like he usually did. On May 20, 2011, Falcon, who had not seen Wiggins since before Easter, telephoned Wiggins's home and left a message insisting that he telephone her or she would call the police. The next day, Montenegro telephoned Falcon and told her Wiggins was taking care of personal matters. When Falcon asked more questions, Montenegro then said Wiggins was out of town and would contact Falcon on his return. Falcon admitted she did not "get a good vibe" from Montenegro, in part because Wiggins had told her Montenegro had asked him for money.

Silvia Fonseca was another of Wiggins's neighbors, and last saw him around the end of April 2011. She later saw some people moving potted plants from Wiggins's residence. Fonseca found that strange because Wiggins rarely moved things, and he had not consulted her as he usually did. Approximately a couple of days later, Fonseca saw Montenegro driving Wiggins's car, something Fonseca had never seen Montenegro doing while Wiggins was alive.

Robert Baltes, Wiggins's landlord, testified that on April 20, 2011, when he went to Wiggins's residence to pick up a rent check, Wiggins had introduced Montenegro as his girlfriend and said she would move in with him. On May 17, 2011, when Baltes returned to Wiggins's house to pick up the next month's rent, he did not see Wiggins;

3

rather, Montenegro gave Baltes the rent check. Baltes assumed she was living with Wiggins. Baltes testified that Wiggins was small and "[Montenegro] was maybe a little bit bigger" than Wiggins.

Wiggins's daughter-in-law, Michele Wiggins,[2] testified she lived in Houston, Texas, and usually spoke with Wiggins by telephone once a month, if not more. She last did so on March 2, 2011. At some point, she and Wiggins talked about him wanting to visit her in Texas in May 2011. Wiggins told Michele that Montenegro had asked Wiggins to leave her money for her children but Wiggins did not want to do that. Michele spoke to Montenegro about this matter, and Montenegro said she was angry with Wiggins, who did not want to leave $500 with her children and leave his car with Montenegro. Therefore, Wiggins decided not to visit Michele. Michele testified Wiggins never loaned his car to Montenegro or anybody else.

Michele testified that on Easter, which fell on April 24, 2011, and several days afterwards, she tried telephoning Wiggins at different times, but he never replied, which Michele thought was "weird." On May 19, 2011, Michele telephoned the Los Angeles County Sheriff's Department requesting they do a welfare check on Wiggins. That same day, Montenegro telephoned Michele, saying Wiggins was out of town with a drug dealer named "Emmett." Michele asked Montenegro to have Wiggins call her, and Montenegro replied that after Wiggins returned, she and he were going out of town for a week. A couple of days later, Montenegro telephoned Michele, saying Wiggins had a drug

---

[2] We refer to Michele Wiggins by her first name to avoid confusion.

4

problem and she was trying to convince him to get help from the Veteran's Administration.

Detectives obtained copies of Wiggins's bank statements, which showed bank transfers made after the date of Wiggins's presumed death. Specifically, on April 25, 2011, three money transfers were made from Wiggins's savings account to his checking account: two $500 transfers then one $300 transfer. On April 26, 2011, someone used Wiggins's bank card to withdraw money from a Pomona, California branch of Wiggins's bank. Bank surveillance video captured images of someone using Wiggins's bank card at a bank branch in Diamond Bar on April 26, 2011. On May 12, 2011, surveillance video captured Montenegro driving Wiggins's car at a gas station in Glendora, where Wiggins's credit card was used that day. On May 20, 2011, someone transferred money from one of Wiggins's accounts to another; someone also withdrew $500 from Wiggins's bank account.

Eugenio Montelongo testified that on May 8, 2011, Montenegro, who is his cousin, unexpectedly came to his residence in Bell Gardens between 9:00 p.m. and 10:00 p.m., and left two plastic pots with plants in them. She asked him to keep the plants for her, saying she would take them to Santa Barbara later.

On May 25, 2011, Montenegro telephoned Michael Hachem sounding hurried and distraught, and asked to meet him at a coffee shop. At the meeting, Montenegro asked Hachem if he knew of a place without security cameras where she could buy untraceable phones. Montenegro explained that some people had been harassing her and claiming that she knew the whereabouts of one of her male friends.

5

On May 26, 2011, Los Angeles County Sheriff's Detective Diane Harris telephoned Montenegro regarding Wiggins, who had been reported missing. Montenegro said she had seen Wiggins the previous day at a park in Pomona, where he was doing drugs with Emmett. Montenegro said she would have Wiggins telephone Detective Harris. On May 26, 2011, Detective Harris searched Wiggins's home pursuant to a search warrant, but found nothing indicating that a struggle had occurred there or that Wiggins was a drug user. There also was no sign that Wiggins's television or other furniture were missing. However, detectives noticed that a knife was missing from a knife holder in Wiggins's kitchen.

On May 29, 2011, Matthew Bell, Montenegro's cousin, was at his residence in Ontario, California, when Montenegro arrived with two men. She asked if Bell, his girlfriend and brother could leave the residence for approximately one hour, and in exchange she would give them $100. Bell and his group immediately left the residence, but soon returned there upon realizing Montenegro had not given them any money. They saw a man digging in the backyard, and Montenegro and another man were nearby. Montenegro appeared panicked when she saw Bell. The other men left. Montenegro started pacing and told Bell and his group something like, "I'll give you guys like, $5,000 each to help me. Help me get rid of him. I need to get rid of it." Bell and his brother walked to the backyard, and Montenegro directed them to get a trash can from the front of the garage. Bell complied. Montenegro unearthed human body parts from a hole in the ground and threw them into the trash can. Bell started to vomit, left the area with his

6

group, and telephoned his mother. Montenegro dragged the trash can as she followed Bell and his group on the street and asking them to come back.

That day, Ontario Police Officer Michael Gonzales was on patrol and en route to Bell's residence when Bell flagged him down and directed him to Montenegro, who was walking down the sidewalk with a trash can. When Officer Gonzalez got close to her, she froze, and stared at him blankly. Montenegro had dirt all over her, and Officer Gonzalez smelled a strong foul odor of dead material. A forensic specialist analyzed the contents of the trash can, and found in it Wiggins's torso, two dismembered legs, latex gloves, a syringe, and a piece of zip tie, among other things.

Ancecito Paredes testified that at some point in May 2011, Montenegro asked him if he could help her store a box containing some pieces of carpet. When Paredes refused, Montenegro became sad and cried. Paredes decided to ask his friend David Chavez to store the box, and Chavez agreed. Therefore, on May 22, 2011, Paredes drove to an apartment, picked up the box and took it to Chavez's house.

Chavez testified that in May 2011, Montenegro visited his residence with Paredes, and requested that Chavez keep a closed box at his residence. Chavez agreed and never looked inside the box. Montenegro also discussed renting a place to stay at Chavez's residence, but said she would need a fence installed to enclose the property.

On May 30, 2011, Ontario Police Officer Henry Melendez responded to Chavez's residence, and retrieved the box Montenegro had left there.

On June 1, 2011, Ontario Police Detective Alfredo Parra came to Eugenio Montelongo's Bell Gardens home, responding to Montelongo's call. Detective Parra

7

discovered two severed human arms in one of the potted plant containers. Detective Parra contacted Robert Hunter, a deputy coroner investigator at the San Bernardino County Coroner's office. Hunter went to the Bell Gardens address and found a human skull in the other potted plant container. Hunter took the severed arms and the skull to the morgue.

Detectives found blood splatter on a bedroom door in Wiggins's residence. DNA analysis of that blood matched Wiggins's DNA. Detectives also examined the items contained in the box that Montenegro had left at Chavez's residence, including blood-stained carpet matching those found in Wiggins's house, and also some tiles matching those found in Wiggins's residence.

Ontario Police Sergeant Chris Martinez testified that Carmen Marquez, who was Montenegro's boyfriend and was about 86 years old, gave police Montenegro's passport and four bank cards belonging to Wiggins. Police impounded Wiggins's and Montenegro's cars. Police found a bottle of bleach in the trunk of Wiggins's car.

Forensic pathologist Glenn Holt testified that on June 2, 2011, he performed an autopsy on Wiggins's body parts (torso, head, two legs, and two arms), which had started to decompose, and which altogether weighed 82 pounds. The pathologist did not know how much Wiggins weighed before he died. The pathologist testified that the extent of Wiggins's body's decomposition was consistent with historical reports that Wiggins had died as of April 24, 2011. Wiggins had received a laceration by blunt force around his right eyebrow. Wiggins was stabbed, apparently with a knife, 24 times to the upper body, including two chest wounds that penetrated the lung. The pathologist testified

8

Wiggins's lung would have collapsed and bled, possibly filling the chest cavity with blood. Wiggins was stabbed in the back 22 times. Wiggins had no injuries to his arms and legs apart from those places where his limbs were severed from his torso. The pathologist believed Wiggins's body was dismembered after he died. The pathologist concluded Wiggins's manner of death was homicide and the cause of death was stab wounds to the torso.

*Defense Case*

At trial, Montenegro denied that she had been in a romantic relationship with Wiggins. Without specifying a date, Montenegro testified that she last saw Wiggins alive at his house in "very early" May 2011. That day she had just finished showering and was wearing only a towel over her undergarments, when Wiggins entered the house and pushed her into his bedroom. Montenegro tried to get away, but Wiggins pushed her on the bed and put his mouth to her chest, groped and raped her. She managed to get away but he followed her and she hurt him by hitting him with her elbow to his eye. She ran out the door and drove to her home in Riverside. There, she showered and tried to forget what had happened. She did not call police because in her experience "they never do the right thing." She did not go to a hospital or call her mother or her children. Montenegro mentioned the incident to Jacque LaFevre, an approximately 85-year-old man with whom she had lived off and on. She went to bed and when she awoke, LaFevre was no longer at home.[3]

---

[3] LaFevre was deceased at the time of trial.

9

Montenegro testified that she saw LaFevre a "few days" later driving Wiggins's car. She estimated that "the first week or into the second week of May," she returned to Wiggins's house with LaFevre, and discovered Wiggins was dead and his body was dismembered. Montenegro did not call the police for fear they would take away LaFevre. When police later telephoned Montenegro, she did not tell them about Wiggins's death because she did not want anything to happen to LaFevre. Montenegro testified she and LaFevre hired two day laborers to remove a carpet from Wiggins's residence and take it in a box to Chavez's residence. Around the end of May 2011, Montenegro returned to Wiggins's home and watered his plants and put his mail on the table. She also drove his car because she did not like putting miles on her own car.

Montenegro testified that after police had insisted on seeing Wiggins, she enlisted some men to unearth his body, which she planned to take to police. Montenegro admitted using Wiggins's bank cards after his death because Wiggins "would want to make sure that [she] had whatever [she] needed." She used the money to pay for gas and Wiggins's dog's expenses. Montenegro admitted Wiggins was already dead when she forged his signature on the check she used to pay the May rent. She also admitted using Wiggins's bank card more than twice after he had died. Montenegro admitted lying to Wiggins's family when they had telephoned her asking about Wiggins's whereabouts. Montenegro admitted lying to Detective Harris about seeing Wiggins with Emmett, and about Wiggins going to drug rehabilitation.

10

*People's Rebuttal Evidence*

Marquez testified that he had been dating Montenegro off and on for almost one year before her legal troubles began. She asked him one day to go to the home of "the man they killed." He therefore went to a home in Diamond Bar and picked up a heavy box that Montenegro said contained papers, but Marquez did not believe it only contained papers. Marquez took the box to his house and the next day someone picked it up from there. Marquez gave police Wiggins's bank cards and other items that Montenegro had left at Marquez's apartment.

Robert Craig, co-director of a center that served meals to senior citizens, testified he knew LaFevre, who often went to the center for lunch. LaFevre appeared to be a small man who had limited upper body mobility. Craig last saw LaFevre in 2011, and he appeared to move slowly. Robert Planas testified that in June 2011, he had an opportunity to talk to LaFevre, who appeared "soft-spoken, kind of frail."

DISCUSSION

I. <em>The Court Did Not Err by Denying the Motion to Acquit</em>

A. *Background*

At the end of the People's case-in-chief, Montenegro moved for a judgment of acquittal under section 1118.1, arguing that no forensic evidence, murder weapon, or tool used to dismember Wiggins's body were recovered or tied to Montenegro to show she had killed Wiggins; rather the People had only presented evidence pointing to Montenegro's postmurder conduct. Montenegro further argued no evidence existed that she had killed Wiggins deliberately or with premeditation to support a first degree murder

11

conviction. The court denied the motion: "The circumstantial evidence is substantial. The behavior of the defendant after the killing of Mr. Wiggins certainly is sufficient to let the case go forward." The court added: "On the issue of first degree, the evidence is that [Wiggins] died by stab wounds, 26 of them. Not all of them fatal. Certainly for someone to go and pick up a knife and then stab the decedent, that's certainly a long enough period of time that could support an argument for first degree murder."

B. *Applicable Law*

Section 1118.1 provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

As the California Supreme Court has explained, "In ruling on a section 1118.1 motion, the trial court applies the same standard used by the appellate court ' " 'in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' [Citation.] 'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.] The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination' [Citation.] The

12

sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review." ' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1079.)

"Murder is the unlawful killing of a human being with malice aforethought. [Citation.] Malice may be either express or implied. Express malice exists when there is a deliberate intention unlawfully to take away the life of a fellow creature. [Citation.] It is implied when no considerable provocation appears or when the circumstances attending the killing show an abandoned and malignant heart." (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1263.)

In order for a killing with malice aforethought to be first rather than second degree murder, the intent to kill must be formed on a preexisting reflection and must have been the subject of actual deliberation or forethought. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*).) A verdict of first degree murder on a theory of willful, deliberate and premeditated killing is proper only if the defendant killed as a result of careful thought and weighing of considerations; as a deliberate judgment or plan, carried on coolly and steadily, especially according to a preconceived design. (*Ibid.*)

"Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact. While reasonable minds may differ on the resolution of that issue, our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946.)

13

" ' "Generally, there are three categories of evidence that are sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. [Citations.] When evidence of all three categories is not present, 'we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.' [Citation.] But these categories of evidence, borrowed from [*Anderson, supra,*] 70 Cal.2d [at pp.] 26-27, 'are descriptive, not normative.' [Citation.] They are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' " ' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1253.) If the *Anderson* factors are not present, a finding of premeditation and deliberation can still be upheld based on substantial evidence from which rational jurors could have found that the killing was the result of preexisting thought and the careful weighing of considerations. (*People v. Boatman, supra,* 221 Cal.App.4th at p. 1270.)

" 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

Even if the evidence regarding some of the *Anderson* factors is weak, we note that "[i]n reviewing sufficiency of evidence claims, each case of necessity must turn on its

14

own particular facts." (*People v. Smith*, (2005) 37 Cal.4th 733, 745.) Further,

"[e]vidence of all three elements is not essential . . . to sustain a conviction." (*People v. Edwards* (1991) 54 Cal.3d 787, 813.) Rather, "[t]hese three categories are merely a framework for appellate review; they need not be present in some special combination or afforded special weight, nor are they exhaustive." (*People v. Booker* (2011) 51 Cal.4th 141, 173.)

C. *Analysis*

The People presented evidence regarding Montenegro's financial motive for killing Wiggins. Michele testified that Wiggins and Montenegro were arguing about whether Montenegro would accompany him to Texas because Montenegro wanted him to give her $500 for her daughter, and she wanted the use of his car, both requests that Wiggins rejected. One of Wiggins's neighbors also testified Montenegro had asked Wiggins for money. Further, after the presumed date of Wiggins's death, Montenegro had Wiggins's bank cards in her possession and used them to withdraw money from Wiggins's bank account and pay for items. Montenegro also was seen driving Wiggins's vehicle, which the neighbors testified had never happened before. The jury could reasonably conclude that Montenegro murdered Wiggins in order to be able to have access to his funds and his car.

Montenegro disputes that she had a financial motive for killing Wiggins, arguing that Wiggins was "far more of an asset to [her] alive than dead." But even if Montenegro regards the financial motive as unreasonable, as stated in *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102, "the law does not require that a first degree murderer have a

15

'rational' motive for killing." (See also *People v. Proctor* (1992) 4 Cal.4th 499, 529 [motive not clear].) The California Supreme Court has stated that the fact of an unreasonable motivation "is true of any senseless killing, but the incomprehensibility of the motive does not mean that the jury could not reasonably infer that the defendant entertained and acted on it." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1238.) Here, the evidence presented in the People's case-in-chief was sufficient to support the financial motive, and that motive was rational given that before Wiggins's death, he was reluctant to give Montenegro money or permit her the use of his car. After he died, she ended up using his money and his car.

We further conclude substantial evidence shows Montenegro had the opportunity to murder Wiggins. Montenegro was in a romantic relationship with him and had shared his residence. The police found that a knife, possibly the murder weapon, had been removed from the kitchen. The murder likely occurred in the part of the house where Wiggins's blood splatter was found, and where the carpet was removed. Given that Wiggins was an older man who, by Baltes's account, was smaller than Montenegro, and when last seen by a neighbor he looked worn down and was moving slowly, it is reasonable to infer Montenegro was able to overpower him and killed him.

Montenegro also claims the prosecution in its case-in-chief did not present sufficient evidence that she acted with the intent necessary for first degree murder. But the evidence suggests Montenegro had to get the knife from the kitchen and take it to a separate room. The number of stab wounds and their placement on Wiggins's body also support a finding of premeditation and deliberation. He was stabbed 24 times to the

16

upper body, including two to the chest, perforating his lungs. In light of the fact police searched Wiggins's residence and found no signs of struggle, a reasonable conclusion is that Montenegro deliberated and premeditated to inflict those stab wounds to the vulnerable areas of Wiggins's body to kill Wiggins when he was unable to defend himself. We conclude the above evidence sufficed to show that Montenegro acted with the intent necessary to commit first degree murder.

The California Supreme Court reached a similar conclusion in *People v. Raley* (1992) 2 Cal.4th 870, where the defendant stabbed the victims numerous times, then drove them around, beat them, and dumped their bodies in a ravine, after which one victim died. The court found sufficient evidence to support the jury's finding of premeditation and deliberation, explaining, "Even if we were to agree that it could only be concluded that the many stab wounds defendant inflicted on each woman were part of an unreflective explosion of violence, his calculated decision to let them bleed for the next 18 hours, to refuse medical attention, to beat them about the head and to dump them on a winter night into an isolated ravine supports the conclusion that he premeditated the death of [the murder victim]." (*Id.* at p. 888.) Here, the jury could reasonably conclude that after stabbing Wiggins 24 times, Montenegro left him to bleed and die, rather than get him medical attention. That calculated decision supports a finding of premeditation.

In *People v. Daya* (1994) 29 Cal.App.4th 697, the court stated: "[I]n this case the deficiency is not in the evidence of culpability but rather the deficiency of any plausible explanation for the abundance of evidence pointing to the defendant's postmurder consciousness of guilt." Likewise, here, there was overwhelming evidence of

17

Montenegro's consciousness of guilt: she lied to Wiggins's family members and neighbors who sought to contact him; she lied to police, giving them the impression Wiggins was still alive, that he was on drugs and would eventually call them back. All indications—given Wiggins's decomposed body—are that Wiggins at that time was already dead. Montenegro also took extraordinary measures to conceal Wiggins's dismembered body parts, separating them and burying some in potted plants, and others in a back yard. She also removed evidence from the crime scene, asking a friend to keep pieces of the carpet that was stained in blood. She asked another friend for a place she could buy telephones that could not be traced.

The substantial amount of consciousness of guilt evidence could reasonably lead a jury to conclude Montenegro had murdered Wiggins; therefore, she was attempting to cover up her involvement in his first degree murder by lying about it and removing evidence from the crime scene. The evidence here tends to negate any inference that she committed the murder in self-defense or based on a provocation because if either circumstance had obtained, she could have called the police and explained what happened, and she would have had no need to lie to police and Wiggins's loved ones.

Montenegro argues that the evidence shows she was just one of several other people involved in hiding the evidence after Wiggins's murder. But under our standard of review, " 'If the circumstances reasonably justify the [trier of fact's] findings,' the judgment may not be overturned when the circumstances might also reasonably support a contrary finding." (*People v. Baker* (2005) 126 Cal.App.4th 463, 468-469.) In summary, there is substantial evidence upon which a rational trier of fact could find beyond a

18

reasonable doubt that Montenegro had the requisite specific intent to murder Wiggins with premeditation and deliberation. (*People v. Hatch* (2000) 22 Cal.4th 260, 272.) Because the evidence is sufficient to support Montenegro's conviction of first degree murder of Wiggins, the trial court did not err by denying Montenegro's motion for judgment of acquittal. (*Anderson, supra,* 70 Cal.2d at pp. 26-27.)

## II.

### *The Court Had No Sua Sponte Duty to Instruct the Jury on Voluntary Manslaughter*

Montenegro acknowledges testifying that Wiggins raped her, but she did not kill him. Nevertheless, on appeal, she contends that the court committed prejudicial error by not instructing the jury sua sponte regarding heat of passion manslaughter. She claims that a properly instructed jury could have concluded that, contrary to her testimony, she killed Wiggins because he had raped her.

A. *Background*

In discussing whether to instruct the jury regarding voluntary manslaughter, the court told counsel: "The defense is that Ms. Montenegro didn't kill Mr. Wiggins and I don't see that there's any evidence to support [voluntary] manslaughter instruction." Defense counsel agreed: "[O]bviously my client testified and she testified that she did not commit this offense. There hasn't been any evidence deduced that would support giving that instruction." The prosecutor also agreed that no such instruction should be given.

19

B. *Applicable Law*

Statutory voluntary manslaughter has been defined as an unlawful killing "*upon a sudden quarrel or heat of passion*" (§ 192, subd. (a), italics added) and the malice required for murder has been implied "when no considerable provocation appears" (§ 188). As a result, both subjectively felt heat of passion and objectively reasonable provocation are needed to negate malice and reduce a murder to manslaughter (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143), whether the heat of passion is generated by a sudden quarrel or a series of provocative acts over a long period of time. Thus, to warrant instructions on provocation and heat of passion, there must be substantial evidence in the trial record to support a finding that, at the time of the killing, defendant's reason was (1) actually obscured as a result of a strong passion; (2) the passion was provoked by the victim's conduct; and (3) the provocation was sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than from due deliberation or reflection. (*People v. Barton* (1995) 12 Cal.4th 186, 201; *People v. Lasko* (2000) 23 Cal.4th 101, 108; *People v. Beltran* (2013) 56 Cal.4th 935, 951.)

The duty to instruct exists even when the lesser included offense is inconsistent with the defendant's own theory of the case and the defendant objects to the instruction. (*People v. Breverman* (1998) 19 Cal.4th 142, 154, 157.) "Generally, when a defendant completely denies complicity in the charged crime, there is no error in failing to instruct on a lesser included offense." (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 709.)

20

"[T]he failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility." (*People v. Breverman, supra,* 19 Cal.4th at p. 165.) A conviction of the charged offense may be reversed as a result of such an error only if, " 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." (*Id.* at p. 178; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

"Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*Breverman, supra,* 19 Cal.4th at p. 177.) "In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Ibid*; see *People v. Sakarias* (2000) 22 Cal.4th 596, 621 [failure to instruct regarding lesser included offense, when evidence in support of that offense "was, at best, extremely weak" did not constitute reversible error].)

C. *Analysis*

Montenegro provided the only testimony regarding Wiggins's purported rape of her. She elaborated that after the rape, she fled Wiggins's residence. She elected not to call the police, go to the hospital or tell her family about what had happened. Rather, she went to her residence, where she showered, spoke to LaFevre about the rape, and went to

sleep, wanting to forget about the incident. According to Montenegro, she did not see LaFevre until a few days later, when he took her to Wiggins's residence and she learned that LaFevre—a frail man in his mid-80's—had killed Wiggins. Separately, police also did not find evidence of a struggle at Wiggins's residence. Because the record is devoid of any suggestion Montenegro killed Wiggins in a heat of passion while she was affected by any provocation regarding Wiggins's purported rape of her, there was insufficient evidence to warrant the court giving a voluntary manslaughter instruction.[4]

### III.

Montenegro concedes she did not object to the court's instruction of the jury with CALCRIM No. 359[5] regarding corpus delicti but nonetheless contends her appellate claim is not forfeited because it implicates her substantial rights. She contends the instruction allowed the jury to infer she killed Wiggins based on her out of court statements alone, thus violating her constitutional rights to due process and to a jury

---

[4]     We point out that at the sentencing hearing, defense counsel moved for a continuance to file a new trial motion, arguing she intended to raise a claim of insufficiency of evidence to sustain the first degree murder conviction, contending the jury could have believed Wiggins raped her. The court stated: "My suspicion is the jury didn't believe that."

[5]     The court instructed the jury with CALCRIM No. 359: "The defendant may not be convicted of any crime based on her out-of-court statements alone. You may only rely on the defendant's out-of-court statements to convict her if you conclude that other evidence shows that the charged crime was committed. [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] The identity of the person who committed the crime may be proved by the defendant's statements alone. [¶] You may not convict the defendant unless the People have proved her guilt beyond a reasonable doubt."

determination of guilt beyond a reasonable doubt.  Montenegro relies on *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1427 (*Rivas*), which concluded the version of CALCRIM No. 359 given here was " 'confusing and internally contradictory and gives a false impression of the law.' "  Assuming the issue is reviewable, we reject it on the merits.

A.  *Applicable Law*

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause."  (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169 (*Alvarez*).)  The prosecution must establish the corpus delicti independent from the admissions of the defendant, thus assuring the accused does not admit to a crime which did not occur.  (*Id.* at p. 1169.)  "The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible.  [Citations.]  There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency."  (*Id*. at p. 1171.)

"The amount of independent proof of a crime required for this purpose is quite small; we have described this quantum of evidence as 'slight' [citation] or 'minimal' [citation].  The People need make only a prima facie showing ' "permitting the reasonable inference that a crime was committed." '  [Citations.]  The inference need not be 'the only, or even the most compelling, one . . . [but need only be] a *reasonable* one.' "  (*People v. Jones* (1998) 17 Cal.4th 279, 301-302.)  "In every case, once the necessary quantum of

23

independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues." (*Alvarez, supra,* 27 Cal.4th at p. 1171.)

The identity of the defendant as the perpetrator is not part of the corpus delicti; identity may be established by the defendant's words alone. (*People v. Frye* (1998) 18 Cal.4th 894, 960, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"Whenever an accused's extrajudicial statements form part of the prosecution's evidence, the cases have additionally required the trial court to *instruct* sua sponte that a finding of guilt cannot be predicated on the statements alone." (*Alvarez, supra,* 27 Cal.4th at p. 1170; *People v. Najera* (2008) 43 Cal.4th 1132, 1137.) The corpus delicti rule is defined in CALCRIM No. 359 and its predecessor, CALJIC No. 2.72. (*People v. Rosales* (2014) 222 Cal.App.4th 1254, 1258-1259.)

As explained above, *Rivas, supra,* 214 Cal.App.4th 1410 held the first two paragraphs of CALCRIM No. 359 correctly state the corpus delicti rule. However, *Rivas* held the pattern instruction was confusing because of the third paragraph about the declarant's identity: "[T]he reference to identity in CALCRIM No. 359 presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime—and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' (CALJIC No. 359, 3d

24

par.), which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party. The instruction requires reconsideration." (*Id.* at p. 1429.)

*Rivas* acknowledged that in *People v. Foster* (2010) 50 Cal.4th 1301 (*Foster*), the California Supreme Court upheld CALJIC No. 2.72, the predecessor corpus delicti instruction. *Rivas* distinguished *Foster* because "[t]he wording of CALJIC No. 2.72 is quite different" and the predecessor instruction properly explained that identity was not an element of the crime, whereas CALCRIM No. 359 failed to do so. (*Rivas, supra,* 214 Cal.App.4th at pp. 1429-1430.)[6]

We disagree with *Rivas* and believe the better view is expressed in *People v. Rosales, supra,* 222 Cal.App.4th 1254, which reviewed the purpose of the corpus delicti rule, disagreed with *Rivas*, and held the third paragraph of CALCRIM No. 359 was not confusing: "It is . . . well established that a defendant's inculpatory out-of-court statements may . . . be relied upon to establish his or her identity as the perpetrator of a crime. [Citations.] This is because the perpetrator's identity is not part of the corpus delicti. [Citations.] [¶] CALCRIM No. 359, like CALJIC No. 2.72, clearly so states.

---

6       After the *Rivas* decision, the Judicial Counsel revised CALCRIM No. 359, which now states: "The defendant may not be convicted of any crime based on (his/her) out-of-court statement[s] alone. You may rely on the defendant's out-of-court statements to convict (him/her) only if you first conclude that other evidence shows that the charged crime [or a lesser included offense] was committed. [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] This requirement of other evidence does not apply to proving the identity of the person who committed the crime [and the degree of the crime]. If other evidence shows that the charged crime [or a lesser included offense] was committed, the identity of the person who committed it [and the degree of the crime] may be proved by the defendant's statement[s] alone. [¶] You may not convict the defendant unless the People have proved (his/her) guilt beyond a reasonable doubt."

The corpus delicti rule is stated in the first two paragraphs of CALCRIM No. 359. The law concerning proof of identity by a defendant's extrajudicial statements is correctly stated in the third paragraph. There is no danger a jury will be unable to separate the two rules any more than in CALJIC No. 2[.]72 which has been approved by our Supreme Court . . . . As noted, CALJIC No. 2.72 states in part: 'The identity of the person who is alleged to have committed a crime is not an element of the crime [nor is the degree of the crime]. The identity [or degree of the crime] may be established by [a] [an] [confession] [or] [admission].' CALCRIM No. 359 states with greater precision and economy of language, 'The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone.' CALCRIM No. 359 correctly states the law. [Citations.] There was no reasonable likelihood the jury was confused and misapplied the instruction. Finally, CALCRIM No. 359 reminds the jury that the accused may not be convicted unless the prosecution proves guilt beyond a reasonable doubt. CALJIC No. 2.72, which was approved by our Supreme Court in *Foster,* [*supra,* 50 Cal.4th 1301,] contains no such reminder." (*Rosales, supra,* 222 Cal.App.4th at pp. 1260-1261; see also *People v. Reyes* (2007) 151 Cal.App.4th 1491, 1498.)

We agree with *Rosales's* analysis of the corpus delicti rule and CALCRIM No. 379, and similarly conclude the instruction was not confusing and did not mislead the jury.

IV.

26

*The Court Did Not Err by Instructing the Jury With CALCRIM No. 362*

Montenegro contends the court erred by instructing the jury with CALCRIM No. 362 regarding consciousness of guilt, an instruction that she maintains was not supported by substantial evidence because she made no pretrial statements relating to Wiggins murder; rather, her statements related to disposing of Wiggins's body. Montenegro contends the jury instruction was argumentative because it "invited the jury to assume the prosecution's version of the facts: namely, that the false and misleading statements appellant made during the course of her attempts to dispose of the victim's body parts meant she was the one who killed him." She also contends the instruction was confusing and misleading because unlike CALJIC No. 2.03, the predecessor instruction, it did not specify it applied to her statements made "before this trial."

A. *Background*

Over Montenegro's objection, the court instructed the jury with the following modified version of CALCRIM No. 362: "If the defendant made a false or misleading statement relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show she was aware of her guilt of the crime and you may consider it in determining her guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."[7]

---

7      The Judicial Council version of CALCRIM No. 362 reads: "If [the] defendant [<*insert name of defendant when multiple defendants on trial*>] made a false or misleading statement before this trial relating to the charged crime, knowing the

27

B. *Applicable Law*

In *People v. Beyah* (2009) 170 Cal.App.4th 1241, the court concluded: "[W]e doubt that the CALCRIM Committee intended CALCRIM No. 362 to be used as it was here: to permit an inference of consciousness of guilt based on knowingly false or intentionally misleading statements in a defendant's trial testimony. Nevertheless, we conclude that defendant suffered no prejudice, because California law makes clear that a defendant's false trial testimony may, in proper circumstances, be considered as evidence of consciousness of guilt." (*Beyah,* at pp. 1248-1249.)

C. *Analysis*

We reject Montenegro's preemptive conclusion that CALCRIM No. 362 was inapplicable because "[n]one of [her] pre-trial statements . . . pertained to the killing of Samuel Wiggins." The language of CALCRIM No. 362 broadly refers to a defendant's statement "relating to the charged crime." By its own terms, the instruction permitted the jury to reasonably conclude that Montenegro's statements to Bell and his group to help her get rid of Wiggins's body parts related to Montenegro's involvement in killing Wiggins. Montenegro's contrary conclusion is based on a cramped interpretation of the instruction. Further, to the extent the instruction left it to the jury to "decide" the "meaning and importance" of Montenegro's statements, it was not argumentative because

---

statement was false or intending to mislead, that conduct may show (he/she) was aware of (his/her) guilt of the crime and you may consider it in determining (his/her) guilt. [You may not consider the statement in deciding any other defendant's guilt.] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

28

it did not direct the jury to adopt any particular interpretation of the facts. Finally, the instruction specifically provided that Montenegro's words alone were not sufficient to prove her guilt. In light of the above, we conclude the court did not err by instructing the jury with CALCRIM No. 362.

## V. *There Was no Cumulative Error*

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) " '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

However, as discussed *ante*, since we have found none of Montenegro's claims of error prejudicial, a cumulative error argument cannot be sustained. No errors occurred, which whether viewed individually or in combination, could possibly have affected the jury's verdict in this case. (*People v. Martinez* (2003) 31 Cal.4th 673, 704.)

## DISPOSITION

The judgment is affirmed.

29

O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McINTYRE, J.